**DURALITE COMPANY, Inc., Petitioner,**
v.
**LOCAL 485, INTERNATIONAL UNION OF ELECTRICAL, RADIO & MACHINE WORKERS, AFL-CIO, Respondent.**

**LOCAL 485, INTERNATIONAL UNION OF ELECTRICAL, RADIO & MACHINE WORKERS, AFL-CIO, Plaintiff,**
v.
**DURALITE COMPANY, Inc., Defendant.**
Civ. Nos. 62-C-139, 62-C-314.

United States District Court
E. D. New York.
June 22, 1962.

Kimmell & Kimmell, Mineola, N. Y., for Duralite Co., Inc., Leonard S. Kimmell, Mineola, N. Y., of counsel.

Abramson & Lewis, New York City, for Local 485, International Union of Electrical, Radio & Machine Workers, AFL-CIO, Leonard Greenwald, New York City, of counsel.

BARTELS, District Judge.

Both actions herein, brought pursuant to Section 301, L.M.R.A., 29 U.S.C.A. § 185, raise the question of whether there is a contract between a labor organization and an employer which has been violated. Action 62-C-139 is brought by Duralite Company, Inc. ("Duralite") to stay pending arbitration proceedings commenced by Local 485, International Union of Electrical, Radio & Machine Workers, AFL-CIO ("Local 485"), and by an order to show cause Duralite seeks a restraining order enjoining such proceedings. Action 62-C-314 is brought by Local 485 to compel such arbitration, and by motion under Rule 56, Fed.Rules Civ.Proc., 28 U.S.C.A., Local 485 seeks summary judgment. Both applications were heard and shall be treated together since the decision of

either application is determinative of the other. The two actions stem from a long history of dealing between the parties, and only those facts directly relevant to the case at bar will be set forth.

In February, 1959, while Duralite was under contract with another union (herein "Local 222"), Local 485 obtained authorization cards from a majority of Duralite's employees, in consequence of which on February 12, 1959 Duralite recognized Local 485 as the exclusive bargaining agent of its employees, agreeing to enter into a contract with Local 485 when the existing labor contract terminated. As of February 13, 1959 representatives of Local 222 were excluded from Duralite's plant, check-off of Local 222 dues ceased and a notice was posted by Local 485, with Duralite's permission, stating that membership in Local 485 was to be a condition of employment. On July 1, 1959 a three-year contract between Duralite and Local 485 was executed. From this conduct several unfair labor practice charges were filed with the National Labor Relations Board ("the Board"). On September 1, 1960 Duralite moved to New Jersey and entered into another contract with Local 485, recognizing it as the bargaining representative of the New Jersey employees. Thereafter, on December 7, 1960, an employee filed a new unfair labor practice charge against Duralite. On *May 9, 1961* Duralite and Local 485 entered into a stipulation with the Board which provided in part that Duralite would cease and desist from:

"(a) Recognizing Local 485 * * as the exclusive representative of any of its employees * * * concerning grievances * * * unless and until said labor organization shall have been certified * *.

"(b) Giving effect to its contract with Local 485 * * * unless and

until said labor organization shall have been certified * * *." [1]

The stipulation further ordered Duralite to

"(a) Withdraw and withhold all recognition from Local 485 * * * as the representative of any of its employees for the purpose of dealing with Duralite with respect to grievances * * * until" Local 485 was certified.

However, the stipulation further provided that "it shall be of no force and effect" until approved by the Board.

Prior to the approval by the Board of the stipulation, a local of the International Brotherhood of Teamsters claimed to represent Duralite's employees and fifteen Teamsters were employed by Duralite. On *July 8, 1961* Duralite temporarily shut its plant. For the purpose of this opinion, the reason the plant was closed is irrelevant; of importance only is the fact that it was closed.

On July 11, 1961 Duralite and the two unions met under the auspices of the New Jersey State Board of Mediation in an attempt to resolve the dispute, but the meeting was unsuccessful. One week later, on *July 18, 1961*, the Board approved the stipulation and it took effect. The following week, on *July 25, 1961*, the Board issued a decision and order in the matter of the grievances previously filed arising out of the dispute between Local 222 and Local 485. That order provided in part that Duralite cease and desist from "Recognizing or contracting with Local 485 * * * as the representative of *any of its employees* * * *." (Emphasis supplied) and from:

"Giving effect to, performing, or in any way enforcing its agreements entered into beginning February 12, 1959, or any modifications, extensions, supplements, or renewals

[1]. The directory passage continued: "provided, however, that nothing herein shall be construed *to require* Duralite * * * to vary or abandon the wages, hours, seniority or other substantive features of its relationship with its employees, established in performance of such agreement or to prejudice the assertion by the employees of any rights they may have thereunder." (Emphasis added)

thereof, or any other contract, agreement, arrangement, or understanding entered into with Local 485 * * * relating to grievances * * * " until Local 485 was certified. •

Election proceedings are still pending and Local 485 has not been certified to date.

On January 18, 1962 the New Jersey State Board of Mediation informed Duralite that it would proceed to arbitrate grievances filed by Local 485 arising from the temporary shutdown of its plant.[2]

The pertinent contentions of Duralite are that the Board's orders served to vitiate the agreement *ab initio*, or if not, at least served to bar Duralite from "recognizing" Local 485 and "giving effect" to the agreement by arbitrating the grievances. Local 485 asserts, among other arguments not here relevant, that such stipulation became effective only after the occurrence of the grievance and hence cannot bar the arbitration, and that the Board did not terminate the contract by approving the stipulation since on its face the stipulation preserves the substantive features of Duralite's relationship with its employees.

The issue before the Court is whether arbitration can be restrained or ordered with respect to grievances which arose prior to the issuance of orders by the Board directing Duralite to cease and desist from recognizing Local 485. This raises questions of both the validity of the agreement between the parties and the subsequent enforceability of the agreement if valid.

The Court has been unable to discover any case law dealing with the effect of such an order as is here involved. As a matter of logic, however, certain conclusions seem inevitable. First, the decision of the Board stemmed from offensive conduct by both parties which began prior to the execution of the agreement, so that the execution of that document constituted an unfair labor practice which destroyed the very essence of the agreement.[3] It was the intention of the Board to preclude any dealings between the parties until Local 485 was duly certified.[4] Second, the order of the Board dated July 25, 1961, ordered Duralite to cease giving effect to or enforcing "any agreement entered into beginning February 12, 1959"[5] with Local 485. Under this order any contract was unenforceable from its inception even though the order was issued subsequently. Third, arbitration at this time would be an act of recognition both of Local 485 as the representative of Duralite's employees and of the validity of the contract, in direct violation of two Board orders.

Local 485 nevertheless insists that arbitrable issues remain which arose out of the *relationship* between the parties as employer and employees' representative, which is recognized in the Board's order of July 11, 1961 approving the stipulation.[6] The answer to that argument is obvious. The relationship referred to which survives is not between Duralite and Local 485, but between Duralite and its individual employees, having no genesis in a collective bargaining agreement, but rather flowing from their status as employees.

2. The letter sent to Duralite stated, in part:
   "We have before us a copy of the contract between Local 485 IUE and Duralite Company which designates us as the arbitration agency. We believe, therefore, we have no choice but to honor the Union's request for arbitration."

3. The taint here was in the execution of the contract, and is thus distinguishable from the execution of a contract which contains severable unlawful clauses. See Ebinger Baking Co. v. Local 802, D.C. N.Y., 1961, 194 F.Supp. 617; Restatement of Contracts, § 607.

4. An analogy may be drawn from contracts prohibited by law. Restatement of Contracts, § 508.

5. The date on which the parties first agreed to execute a contract on July 1, 1959.

6. See footnote 1, supra.

Consequently, the Court concludes that the contract with respect to which arbitration is urged is not valid. However, were the contract valid, it would still be unenforceable, and the motion by Local 485 for summary judgment in 62–C–314 must be denied. Duralite's application (62–C–139) is in no better position. Since the purported collective bargaining agreement between the parties is at worst invalid and thus is not a contract between an employer and a labor organization, and is at best unenforceable and thus no suit for "violation" may be entertained, no jurisdiction exists in this Court to pass upon the matter. Therefore, both actions must be dismissed. Rule 12(h) (2), Fed.Rules Civ.Proc. 28 U.S.C.A.

Settle order within five (5) days on two (2) days' notice.